Judge Roane.
Upon the merits of this case, I concur in reversing the decree in question; upon the ground that the sentence in St. Domingo, stated in the record, was- authentic and admissible evidence, for the reasons which have been assigned; and because it appears that the loss of the ves'sel and cargo was produced by the act of S. M. Brown, who was, at the time, a part owner of the ship, and a partner of the present appellee. As that act, if it had succeeded, would have produced a profit to the company of which he was a partner, so. in the event which has happened, they should abide by the loss. This is especially the case, as the present appellee asks the aid of a court of equity. It would be highly unjust to add to the calamity brought upon the appellant by the act of the appellee by his partner, in the loss of his cargo, by decreeing him to pay the freight and insurance of the vessel. If those items are stricken out of the appellee’s account, or even S. M. Brown’s proportion thereof, the balance will be in favour of the appel *77 Sant: the consequence of which is, that, in my opinion, both decrees ought to be reversed, and the bill dismissfid.
Judge Flemxno.
Without a critical examination of the irregularity of the proceedings in this case, (as they have been particularly noticed by Judge Tucker ; and as the appellant, in his answer, by his agent James Barry, took only a slight exception to them, but admitted the accounts filed by the plain lift’s to be correctly stated, except as to two items, to wit, the charge for the freight of tlxe ship Favourite, from the 10th of March, 1793, until the 4th of January, 1794, and the charge; for the insurance of the said ship,) I proceed to consider the cause on its merits, which seem to place the appellant on still firmer ground. And the first and principal question is, whether a copy of the proceedings, against the ship Favourite, in the island of St. Domingo, and referred to in the appellant’s answer, be authentic and admissible evidence ? and, if so, 2dly, what effect it ought to have on the cause.
With respect to the first point; the late Chancellor Wythe, in his decree, the 7th of March, 1804, declared that evidence not authentic: but, notwithstanding the great respect I have, and ever had, for the opinions of that venerable, learned and upright judge, I cannot but differ with him on the present occasion; 1st. Because the admission of them is agreeable to the spirit and principles of our act of assembly of 1792, c. 91.(a) Although they may not be attended, precisely, with all the formalities required by the said act, they are certified under the hand and seal of Adam Williamson, then governor, &c. of that parí; cf the island of St. Domingo, where those transactions had taken place under the French government, (and which had fallen into the hands of the British by conquest,) and are attested by William Shaxv, the said British governor’s secretary r *78 which to me appears the best evidence of their authenticity, that the nature and circumstances of the case would admit of. ,
2. Because we have a precedent of this court, in the case of Young v. Gregory, 3 Call, 446. where the proceedings on an attachment in a foreign country, were adjudged by the whole court to be legal evidence, although no copy of them was produced; and the only-proof of their existence was by depositions and letters $ which was very far short of the proofs in the case before us, where well attested copies of the proceedings, in both the French and English languages, appear in the record.
And, 3dly, because there is no other evidence of the loss of the ship Favourite; without proof of which the plaintiffs have not a shadow of right to demand the insurance, which constitutes a very important charge in their account against the appellant.
The authenticity of those papers, then, being established to my satisfaction, I proceed to consider the effect which, as I conceive, they ought to have on the cause. They support every material allegation in the appellant’s answer; and it appears on the face of the whole record, that Samuel M. Brown was part owner, and captain, or commander of the ship Favourite, and on the 10th day of March, 1793, as agent, and in behalf of the owners, was party to, and signed, the charter-party under which she sailed from a place called The Mother Bank, (where she then lay,) to Philadelphia, there took in a cargo of flour, and from thence sailed to Port-au-Prince in the island of St. JDomingo, (then under the government of France,) where she safely arrived in autumn, 1793; .S'. M. Brown, one of the plaintiffs in the cause, (though he had employed another captain,) being still on board, and, by his own acknowledgment, having the sole direction and management of the ship, both with respect to the disposal of the cargo of flour taken on board at Philadelphia, *79 and the reloading her for the further prosecution of her voyage under the charter-party. And here commenced his extraordinary, illegal, and fraudulent conduct, by means of which the ship and cargo were forfeited, condemned and IgsI to the owners, of whom he himself was one; and, also, as before observed, the agent of the whole. His misconduct, by which the ship and cargo were lost, was briefly this : having a very considerable interest in the cargo taken on board at Port-au-Prince, (whether solely for himself, or, which is more probable, for himself and Jameson, who, at the commencement of this suit, about fifteen months after the loss of the ship and cargo, styled themselves u Robert Brown Jameson and Samuel Montgomery Brown, merchants, trading under the firm of Robert Brown Jameson CoP seems not very material,) he, Bi own, in order to defraud the French government of their export duties to a considerable amount, and thereby save so much to the company, attempted to smuggle 63,776 pounds of coffee, by taking on board so much more than was entered at the customhouse of Port-au-Prince. The fraud, however, having been detected, the catastrophe above mentioned consequently followed.
Brown, in order to exculpate himself from misconduct, preferred a petition to the officers of the government, and stated that, being a stranger, and ignorant himself of the commercial laws of the colony, he chose an obscure merchant (one Forbes) to direct him in his operations ; and, when it was necessary to make his declaration of the cargo on board, Forbes was in gaol; and one of his representatives (not named) charged himself with fulfilling the customary formalities, and led him into the error, by telling him that the declaration was conformable to the tarifa which regulate coffee hogsheads at 9 quintals, sugar hogsheads at 1G, &c. I3ut his apology was thought too futile to have any operation in his favour; as it appeared the entry was short of the quantity *80 actually on board, not only 63,776 pounds in weight, hue also 36 packages in number; to wit, 24 hogsheads, 1 tierce, and 11 barrels. '
But, admitting that he was misled by the unnamed representative of Forbes; he was inexcusable for applying to him for advice ; for it appears, from a document exhibited by the plaintiffs themselves, that, on the 11th of March,, 1793, (the day after the date of the charter-party,) Brown was instructed to apply, on his arrival at Port-au-Prince, to Monsieur Góursas de Bellevue, (a particular friend of the Marquis de Feronays, on whose behalf the charter-party was made,) as qualified to give him the first information of the state of the commerce of St. Domingo ; and to collect from that gentleman the most essential details of what might be necessary to prosecute their plan with success ; and further to consult him (as a correspondent of the Marquis de Feronays) on the local circumstances of the island. But, instead of following this prudent and salutary instruction, he applied, by his own confession, to an imprisoned merchant, by whose advice his-conduct in that important business was to have been governed; and who being in gaol at the time of reporting and entering the cargo, “ one of his representatives” (without a name) “ ch.arged himself with fulfilling the customary formalities, and led him into an error,” the fatal consequences of- which have already-been noticed.
It being- manifest that the loss of the ship and cargo was occasioned by the unjustifiable conduct of Brown, I have no hesitation in saying that retribution ought to be made to the sufferers; and, particularly, to the appellant, and those concerned with him in interest, for the loss of the proceeds of the cargo of flour shipped on their account at Philadelphia. But a question may arise, by whom, and in what manner, ought the retribution to be made ? I answer, by the owners of the ship Favgurite, the misconduct . of whose agent, and part *81 owner, caused the loss; and by a forfeiture of the freight, and of the insurance made on the ship. Besides, there is no evidence that the appellant ever received a shilling-on account of insurance, though charged to him in the plaintiff’s account.
But the chancellor, in his decree affirming that of the county court, observed that u if d". M. Brown was responsible for the loss of the ship, and the product of the cargo,” (which he seemed much to doubt, keeping in view the idea that the proceedings against the ship at Po t-au-Princc were inadmissible evidence,) “he was privately responsible, and that the surviving copartner is not bound to make reparation, unless he appear to be so much the debtor of Brown, on the settlement of their private accounts.” But the transaction makes a very different impression on my mind. Brown was not acting as an individual in a private capacity, but as the avowed agent of the owners of the ship; which clearly appears by the charter-party, and by his subsequent conduct; and, in tny conception, they areas much bound by, and as responsible for, the acts of their agent, as if they had all been on board, and personally assenting to the transactions which occasioned the loss of the ship and cargo. And, admitting that Jameson is not bound, as the surviving copartner of Brown, in a distinct mercantile trade, he is responsible as part owner of the ship, and must forfeit his proportion of the freight and insurance. And it appears that, if those two items be stricken out of the account, or even .S’. M. Brown's moiety of them, the balance will be in favour of the appellant. And I know not a case where the maxim that “ whoever asks equity must appear with pure hands and do equity,” more forcibly applies than in the one now before us. I am, therefore, of opinion, that both decrees are erroneous, and ought to be reversed, and the bill dismissed with' costs; though without prejudice to any suit or action *82 vfhich the plaintiff may be advised to bring hereafter, for the same subject.
by the Court
j both decrees reversed, and bill dismissed, “ without prejudice to any suit or action which the appellee may hereafter be advised to institute relative to the subject matter of controversy.”
On motion of Mr. Wickham, suggesting that the documents from St. Domingo had not been faithfully translated, the court agreed that another translation might be made, and used in support of a motion for a rehearing of the cause.
Accordingly, on Tuesday, the 19th of March, he laid before the court the new translation, which, he contended, proved (more completely than the former) that the body of men by whom the ship was condemned were not a judicial tribunal, and their decision not a legal sentence, but a mere act of plunder; since Brown was arbitrarily condemned, without being heard in his defence. He relied also on the reasoning, and authorities cited, in the opinion of Judge Cooper, of Pennsylvania, upon the effect of a sentence of a foreign court of admiralty.(a)
Wirt observed that all these matters were explained to t^e court, and commented upon at the former argumenf;. If this course be pursued, when shall we ever 1 1 wet to the end of a cause ? ° ■
Judge Cooper stood alone, against all the other judges of Pennsylvania. The case of Hooe and Harrison v. Pierce's Administrator(b) is also against him.(1) But what have we to do, in this case, with the conclusiveness or inconclusiveness of the sentence of a foreign court, of- admiralty ? Judge, Cooper contends for no *83 more than that it is not conclusive, but may be rebutted by evidence. This is enough for our purpose ; there being no evidence to rebut the sentence.
It is true, there was no court of admiralty in the island. The intermediary commission was the only power to decide on the subject; but their authority was complete, and their decision equally obligatory with that of a court. Their being possessed of arbitrary powers, is no objection; for such was the nature of the government in the West Indies under the old regime, as well as since the revolution, (a)
Under the old government, mandatory letters from the king’s minister were laws, from which no appeal could be taken. Samuel M. Brown might have been tried, by the governor and five judges appointed by him, and hung on the spot. The governor was an absolute prince, and had power to stop judicial proceedings.

Wickham.

Mr. Wirt's quotations, proving that the commissioners possessed arbitrary powers, show plainly (as well as their own confession) that their sentence was not one of a judicial tribunal. The loss by their act is, therefore, such as comes within the insurance “• against detention by kings and princes.” But, even if the commissioners had been a court of justice, it ís a rule that, if it appear on the face of the proceedings, that a court acted unjustly, its sentence is not to he regarded. They refused to hear Brown in his defence. The assertion of those who proceeded illegally against him is not evidence of his guilt. Their sentence is not even prima facie evidence; being rebutted by the circumstance that they refused to hear him.
Wednesday, March 27th, the judges declared their ad' herence to their former opinions.
Judge Tucker
only said, he had considered the subject, and saw no cause for changing his opinion formerly delivered»
*84 Judge Roane.
In the few remarks I made, in delivering my opinion in this case, on the former occasion, I stated that I considered the record of condemnation in St. Domingo, (referred to in the proceedings,) as> authentic and admissible evidence, to prove as well the ground as the fact of that condemnation. In saying it was authentic, I meant that it was as well verified as (all circumstances considered) could be expected; and, in expressly allowing it to be admissible evidence, I certainly did not decide that it was conclusive. That was not necessary; for no evidence exhibited on the part of the appellee conflicted with the ground of that condemnation; on the contrary, that ground was corroborated and supported by the conduct of Brown, from his own admission; which admission was one of the principal grounds of my opinion.
On the subject of the conclusiveness of sentences of foreign courts of. admiralty, however the doctrine seems to have been affirmatively settled, in relation to ordinary times and circumstances, I am inclined to think that that doctrine cannot be transplanted into our code, at this time, without producing the greatest injustice. An sera has arrived, when neither the ordinary laws of nations, nor those laws as founded upon treaties and conventions between nations, give the rule; but the arbitrary edicts, and orders, of the king and emperor, with whom we have the most extensive relations; and their judges are sérvile enough to carry them into rigid execution. I should not, therefore, as at present advised, incline to extend to those courts a comity or courtesy to which they are, at the present day, by no means entitled. But here I must pause ! The question is important, and I mean not to prejudge it, as it neither actually occurs in the case before us, nor is it probable that questions of this character will often again occur in this court.
*85 Upon the whole, I see no cause to depart from the opinion X formerly delivered.
Judge Fleming.
I have perused, and considered with great attention, the translation of the documents lately presented to the court; and also the reasoning of Judge Cooper, in the case of Dempsey v. The Insurance Company of Pennsylvania; in which I can discover no ground for changing my former opinion ; but, out of respect to the ingenious remarks made by Mr. Wickham on the subject of them, I am induced to take a brief notice of some of those remarks.
With respect to the documents, they throw no new light, to my conception, on the merits of the cause; they only show the great avidity of those in power at: Port-au-Prince, to have the case of the ship Favourite (libelled for a breach of their revenue laws) brought to a speedy decision: and this may be readily accounted for, from the critical situation of the country; in which a civil war was then carried on with great virulence; and, at the same time, it was threatened with an invasion by a powerful enemy, who, soon after, made a conquest of that part of the island.
With regard to the reasoning of Judge Cooper, in the case of Dempsey v. The Insurance Company of Pennsylvania, where the principal question was, how far the proceedings, and sentence, of a foreign court of admiralty is proper, or conclusive evidence in our courts, in cases between insurers and insured, where vessels are captured at sea; his reasoning shows him to be a judge of distinguished talents, and of extensive legal research: but it is worthy of remark, that his opinion was in opposition to five other judges, of whom the court was composed,! (1) and with whose reasoning, or the grounds of *86 whose opinion, we have not been favoured. And, to me, there appears a clear and important distinction between cases of capture of neutral vessels at sea, and condemning them as lawful prize, either under the French decrees, or the British orders in council, and the case now under consideration. The former cases have emanated from the exercise of power, rather than of right; and are in violation of the general, and long established law of nations, which the courts in all civilized countries are presumed to understand; and in which cases, neither the owners, nor commanders, of the captured vessels are supposed to be in fault; and must be held blameless, unless some pointed evidence should appear to the contrary. But, in the case before us, the law of nations seems out of the question. The ship and cargo were seized and condemned for a manifest infraction of the revenue laws of a power with which we were at peace, and in habits of friendly intercourse ; and in one of whose ports she was trading, and taking in a cargo of merchandise, to complete her voyage. And this breach or infringement of the law, which occasioned the loss of the ship and cargo, was committed by one of the owners, and agent of'the. whole; who was on board, and had the sole, exclusive direction and management of the ship, from the commencement of her voyage to the time of her seizure, or condemnation. In effecting the latter, it is probable that great rigour or strictness, and, perhaps, injustice, might have been practised by the officers of police at Port-au-Prince, where the event took place | but of this we can form no correct judgment, for want of a competent knowledge of the municipal laws of foreign countries in general, and of that country in particular, which, at the time of those transactions, was very probably in a state of revolutionary tumult, and con *87 vuision. But however that may have been, it is evident that the loss of the ship and cargo was occasioned by the imprudent, and, I may add, the unwarrantable conduct of Samuel Montgomery Brown, one of the original plaintiffs in this suit, who, (instead of bringing their action or actions in London, where the defendant lived, where the charter-party under which they claim the freight was executed, and where the insurance was made on the ship,) having discovered some property of the defendant in the hands of a correspondent in the town of Alexandria, made their election, and there exhibited their bill in equity, by way of foreign attachment, against the effects of the defendant; a thousand leagues from the place of his residence, and from where the contracts were made; leaving him to be defended (if defended at all) by a garnishee, unacquainted, probably, with the transactions between the parties; and uninterested in the event of the suit; in the prosecution of which, the irregular, and illegal proceedings have been sufficiently commented upon by a member of this court, on a former occasion. And I shall only add, that, after a mature reconsideration of the case, I am clearly of opinion that the decree, (now sought to be revised and altered,) in favour of the appellee, is correct, and ought mot to bo disturbed.

 Rev. Code, vol. 1. p. 160.

 In the ease of Dempsey, Assiguee of Brown v. The Pennsylvania. See the report of that case by Mr. Dallas, in 1810.

 1 Wash, 212.

 Note by the Reporter. In that case, the effect of the sentence of a foreign court of admiralty did not come in question. The president, in pronouncing the opinion of the court, mentions incidentally, that such a sentence would have been regarded; but to what extent does not appear.

 4 Edward’s History, p. 2, 3. 110, 111.

 Note by the Reporter, The legislature of Pennsylvania, by their act parsed March 29, 1809 (Penn Laws, vol 9 p. 132.) have settled the law of that state in conformity with Judge Cooper’s opinion. See also Calbraith *86 v. Gracie, l Binney's Rep. 296. and Calhaun v. The Insurance Company of Pennsylvania, ibid. 293.